Larry **NADEAU** and Richard Hunt et al.

v.

Raymond A. **HELGEMOE**, Individually and in his capacity as Warden of New Hampshire State Prison, et al.

**Civ. A. No. 76–86.**

United States District Court, D. New Hampshire.

Dec. 6, 1976.

State Prison. A class was certified June 29, 1976, under F.R.Civ.P. 23(a) and (b)(2). The class consists of all prisoners at the New Hampshire State Prison who are or will be confined in protective custody. Jurisdiction is conferred by 28 U.S.C. § 1343(3), (4).

Plaintiffs allege that the conditions of confinement to which they, as protective custody inmates, are subjected are cruel and unusual punishment in violation of the Eighth Amendment of the United States Constitution. They also claim that they are treated unequally without cause in violation of their rights to equal protection and benefit of the law under the Fourteenth Amendment of the United States Constitution. Defendants assert that the conditions of confinement and denial of privileges are a necessary consequence of plaintiffs' need for special security.

■ This issue is not new to this court. I addressed the identical question in *Ceria v. Helgemoe,* Civ. No. 75–300 (D.N.H. 2/9/76). *Ceria* was a *pro se* complaint and neither party fully addressed the issues that this court found dispositive; therefore, in light of the complete development of the facts and briefing of the law in the instant suit, I will reconsider my *Ceria* holding.

### THE FACTS

The facts as found by this court are based on the testimony adduced at the trial, the exhibits, and the court's tour of the New Hampshire State Prison and the Annex in particular. Only when a specific piece of written evidence is relied upon will the source be cited.

There are presently thirty-five inmates housed in the protective custody unit at the New Hampshire State Prison (NHSP). Defts.' Ex. 19. These men are there at their own request. They fear serious bodily assault by members of the general population for a variety of reasons: some have aided the State in prosecutions; some have already been victims of sexual or murderous assault; some are indebted to members of the general population; and some simply can't get along with certain other prisoners for one reason or another. They are housed

Jeffry A. Schapira, Staff Atty., New Hampshire Legal Assistance, Nashua, N. H., for plaintiffs.

James L. Kruse, Asst. Atty. Gen., Concord, N. H., for the State of New Hampshire, for defendants.

### OPINION

BOWNES, District Judge.

This civil rights action brought under 42 U.S.C. § 1983 concerns the living conditions and regulations relative to inmates in protective custody at the New Hampshire

in the protective custody unit because they believe, and the prison administration concurs, that there would be a real threat to their physical or mental well-being were they to remain in the main cell block.

Protective custody inmates are housed in the "Annex," an addition to the NHSP main cell block building that was constructed in 1941. The Annex, a brick building with reinforced concrete floors, is four stories high. It contains 66 back-to-back cells with 22 cells on a floor, 11 cells on a side. The cells face a corridor approximately 70' long and 8' wide lined with windows. They are made of steel plate on three sides with a door and steel bars on the fourth. Each cell is 6' × 8', and is equipped with a toilet-lavatory unit and one steel bunk welded to the wall.

In addition to the protective custody population, farm trusties and maximum security disciplinary inmates are housed in the Annex. The protective custody prisoners comprise four divisions occupying the top two floors of the building; the second floor houses the trusty and disciplinary units. The ground floor of the Annex contains an inmate lavatory, a gang shower, and the prison library. There are exits into the main prison yard, the front prison yard, and the main cell block. There is a single shower stall on each floor.

On the uppermost floor, where two of the four protective custody divisions are housed, there is a security screen made of steel wire mesh that divides the corridor by approximately one-third, leaving about 4½' between the cells and the screen. The screen considerably darkens the area, cuts air circulation and decreases the space available to the inmates during the time they are allowed out in the corridor. The presence of the security screen is one of the main inmate grievances in this case.

There are usually two guards on duty in the Annex. One stays on the first floor at all times to guard the entrances and to answer the telephone and doorbell. The other shepherds the inmates to showers, medical calls, visits, and generally performs the duties not covered by the first guard.

A day in the life of a protective custody inmate is monotonous, to say the least. Breakfast is served at about 7:30 A.M. It is distributed to the prisoners in their cells by inmate workers who dish out the food from a heated food cart to individual trays. The food cart is brought in by an inmate worker from the kitchen and is left on the first floor. The protective custody workers carry the trays up and down the stairs. After breakfast, between 8:00 and 10:00 A.M., approximately twenty men per day shower. This means that each man in the Annex usually showers five times in fourteen days. Showers on weekends are permitted only on special occasions. In the meantime, the inmate workers pick up laundry and cleaning supplies such as garbage bags, toilet paper, brushes and soap, when available, and deliver them to the men. They clean the tiers: sweep, mop, and take down the garbage. These activities cease at about 10:30 A.M.

The luncheon meal is delivered at approximately 10:30 A.M. The inmate workers deliver this meal in the same manner as breakfast. Everything is completed by approximately 11:15 A.M. when the workers return to their cells. A prisonwide head count takes place between 11:30 A.M. and 12:00 noon when everyone is locked in. At that time, second class mail and prescribed medicines are distributed.

Approximately twice a week, protective custody inmates are let into the prison yard for outdoor recreation between 12:00 and 12:45 P.M., and once a week they are taken to the library for about fifty minutes. On every weekday afternoon between 12:45 and 2:45 P.M., they are allowed out into the corridor adjacent to their cells, "the tier," for Divisional Yard Time. These periods are the only times all protective custody inmates are permitted out of their cells.

Once they are locked back into their cells at 2:45 P.M., the inmate workers sweep down the corridors. Personal mail is delivered at that time. The dinner meal is served at 3:30 P.M. and finished by 4:15 P.M. Then, everyone is locked in at 4:30 P.M. for the 5:00 o'clock head count. Medi-

cines are again distributed. Between 5:30 and 7:30 P.M., a time when the general population engages in evening activities, protective custody inmates are locked into their cells. If there is a specific reason, such as a visitor, an inmate is allowed out of his cell at this time. Final lockup for the protective custody unit is 7:30 P.M.

Plaintiffs allege that specific conditions of their confinement are particularly onerous. The most frequently voiced complaint concerns the lack of air circulation and the darkness caused by the steel mesh security screen. The inmates who testified all complained that the screens cut the light in the fifth and sixth divisions so that it is dark and oppressive during the daytime; only the morning sun and electric lights relieve the gloom.

The most oppressive effect of the screen is, however, the blockage of airflow. Although the windows can be opened, little fresh air reaches the inmates, and to quote them, "it stinks." This condition is aggravated by the fact that the steel bunks are welded over many of the ventilation holes in the back wall of the cells and that cleaning materials are in short supply at the prison. Toilet brushes are a cherished item among the prisoners and are passed down from one to another. Cleaning supplies are a particularly rare commodity in the protective custody unit, and the inmates uniformly claimed difficulty sleeping because of the bad air. Even the guards find it "stuffy."

The security screen also significantly diminishes the space on the tier, leaving the inmates less room for whatever diversions they pursue during their Divisional Yard Time. The screen causes some congestion and certainly minimizes opportunities for physical exercise on the tier.

The screen also makes it difficult to watch street activities. In the words of

plaintiffs' expert, psychiatrist Moskowitz, it is "overwhelming stimulus," acting as a visual blockade. For men suffering from "visual perceptual distortion," it can create feelings of acute claustrophobia,[1] and for all the men, it is another barrier to contact with the outside world.

Meals are another cause of complaint, even though there has been a distinct improvement over the years. The food comes from the kitchen on a hot tray, but by the time it reaches the inmates, it is often cold. The trays upon which the food is served are divided into three parts, but the food often spills over the compartments so that the inmates get catsup in their jello. The major inmate complaint concerning the food is that there are rarely any second helpings.

The expert testimony concerning food focused on a different aspect. Meals are eaten in the cells, and the very language used by both the guards and the inmates illustrates that mealtime is solely for eating: a meal is a "feed"; mealtime is "feed time." And to further emphasize to the inmates the starkly biological function of their eating periods and their subordination to the convenience of prison management, meals are served at the hours of 7:00 A.M., 10:30 A.M., and 3:30 P.M. The experts testified that mealtimes should be normalized as much as possible. They said that for any rehabilitation to occur, and even to prevent dehabilitation, the differences between life outside and inside the prison must be minimized. They urged that the men be allowed to eat communally so that eating may become a social as well as a biological event. They found no substantial reason why meals should not be social occasions served at relatively normal times as they are for the general population.

Showers are another subject of complaint. Protective custody inmates shower

1. Dr. David L. Moskowitz, a private psychiatrist from Portsmouth, New Hampshire, testified that plaintiff Alexander Berry suffers from "Post Combat Neurosis," or "Post Vietnam Syndrome" (PVS), a progressively debilitating disease common among Vietnam War veterans. He told the court that "visual perceptual distortion" is commonly associated with PVS and that plaintiff Berry suffers from it. Because of this dysfunction, plaintiff Berry cannot see beyond the screens and suffers from extreme feelings of confusion, oppression and claustrophobia when he attempts to do so. There was no evidence that any other inmates suffered from either this particular problem or PVS.

only five times in fourteen days and very rarely on weekends, while the general population has access to showers on a daily basis.

Beyond the physical aspects of their confinement, plaintiffs assert that they are effectively denied the same care, treatment, and diversion offered the general population. Exercise, recreation, library privileges and work opportunities are restricted in the Annex, and access to medical care, visits, religious services and programs is severely burdened by plaintiffs' justified fear of venturing outside the protected confines of the Annex.

Protective custody inmates must traverse the main cell block if they wish to get to the administrative section of the prison. It is there that visits are held, and that the infirmary and medical, rehabilitational and educational services are available. The inmates uniformly testified to the terror they feel from that ordeal, emphasizing not only the physical danger, but the psychological and emotional humiliation they experience going through the main cell block. The experts testified that forcing protective custody inmates to go through the cell block was not only physically dangerous, but akin to parading a man naked through the streets, a psychologically damaging experience.

Protective custody inmates are, in fact, subjected to both verbal abuse and physical assault, and all complained that the single guard escort provided by defendants is simply inadequate; they believe that a guard would "beat feet," (run away) were a protective custody inmate attacked by another prisoner. Whether or not this fear is justified is immaterial; the protective custody inmates genuinely believe that they are in real danger of being assaulted or killed by certain prisoners in the main cell block and that defendants are not sufficiently responsive to this danger. For some, at least, the fear is based upon assaults that have already occurred. I conclude, therefore, that many of the services and privileges available in the administrative section are effec-

tively unavailable to protective custody inmates.

Visits involve the same emotional gauntlet because they occur at exactly the same time and at the same place as visits for the general population. According to plaintiffs' expert Goff,[2] either defendants are punishing plaintiffs or they are simply not interested in protecting them. The Annex has an indirect entrance to the street, and plaintiffs urge that visitors be conducted to the Annex via this separate entrance and that visits take place in the library.

There are some educational and recreational programs available to protective custody inmates in the Annex. A drug and alcohol rehabilitation meeting, which usually consists of a film and some discussion, is held weekly. High school equivalency courses (GED), tutoring, and hobby craft are also available and wood carving was, but is not now, offered to protective custody inmates. Obviously, only inmates who have completed elementary school but who have not finished high school are eligible for the GED program, and I note that at least two of the four inmates who testified are ineligible. Inmates are allowed to participate in correspondence courses at their own expense.

Defendants urge that, because plaintiffs are not forbidden from joining the classes and programs open to the general population, plaintiffs have the same opportunities as do all other inmates. However, plaintiffs are, in reality, barred from any participation in classes in which members of the general population attend; therefore, plaintiffs do not, as a matter of fact, have similar opportunities, defendants' permission notwithstanding.

The general population has access to the auto school, wood carving, pottery, occasional yoga classes, as well as the regular GED courses, tutoring and hobby craft.

Religious services are held for the general population, but not for the Annex. Although the protective custody inmates testi-

**2.** Donald H. Goff is the Director of the National Prison Project of the United States Commission on Civil Rights and is a nationally renowned expert in penology.

fied that they have made numerous unsuccessful requests for services, Reverend Johnson and Father Talbot testified that there is simply not enough interest among protective custody prisoners to sustain a regular program of religious services. Reverend Johnson holds a weekly Bible class, a nondenominational informal program of prayers and discussion. Both Reverend Johnson and Father Talbot said that they did and would continue to visit any individual who seeks religious consultation or wishes to receive the Sacraments.

Although there are a variety of jobs available to the general population, it is clear that there are simply too few to go around. The jobs that are available are somewhat more interesting than the janitorial jobs obtainable by protective custody inmates. There are at least three facilities providing a combination of work and instruction for the general population: the auto shop, the print shop, and the license plate shop. Except for trusties in protective custody who work in the administrative area of the prison, the only work available to protective custody inmates is cleaning the tiers and delivering the meals. Defendant Helgemoe testified that the janitorial jobs are "make-do" jobs and that several inmates are assigned to do the work that could be effectively performed by one just to provide more inmates with jobs. A total of eleven protective custody inmates, including the three trusties, work.

Pursuant to the July 13, 1976 preliminary injunction issued by this court, protective custody inmates who do not work now receive idle pay of 38¢ per day. Inmates in the general population who do not work are placed on the idle crew and are paid 38¢ a day instead of the 75¢ to $1.25 working prisoners earn. Prior to the July 13 order, protective custody inmates received no money from the prison but were provided with tobacco, razor blades, and hygienic necessities free of charge. Now, they must, like the members of the idle crew in the general population, buy these items with the pay they receive. A daily package of cigarettes costs a man more than his daily idle crew pay. Warden Helgemoe testified that soap is now available in the showers.

Most days, plaintiffs, other than those who work, are locked in their cells twenty-two hours a day. They are allowed on the tier two hours daily, and five times in three weeks are permitted outdoors for about forty-five minutes at a time. The inmates all testified that movement on the tier is difficult because of the lack of space. A tier 70' long by approximately 4½' wide is manifestly an inadequate space for physical exertion for eleven grown men.

Defendants' suggestion that inmates might exercise in their cells is not responsive to the real problem. The cells are too small for any real exertion, but, more importantly, exercise in the cells would not do anything to relieve the monotony of spending most of the day confined in a cell. Exercise is not only a physical, but a psychological necessity; exercise implies, in this context, recreation. I agree with the expert testimony that the tier simply is not sufficient space for either physical exertion or recreation. While it does offer an opportunity to socialize, which is also important, it does not offer the men an opportunity to move their bodies, to experience for a time, a new environment or to refresh themselves with an essentially different activity.

The significance of plaintiffs' Yard Time is diminished by the number of things plaintiffs must accomplish in the forty-five minutes given them five times every three weeks. Yard Time is the only time they can buy canteen items. They are also encouraged to seek medical care at that time, since they need not travel through the main cell block to get to the doctor, but can go through a side door to the infirmary from the yard.

During Yard Time, the inmates may use the "Rec Hall" where there is a weight room and a pool table, and they may play basketball, horseshoes, baseball, and football. The testimony was that few inmates take advantage of these opportunities and most just walk around. The canteen is open about once every week when the inmates are out in the yard. They can buy

shaving equipment, soap, shampoo, other toiletries, food, coffee, and soda, items the prison does not supply.

Two guards are used to overlook the protective custody division's Yard Time. No extra guard coverage is utilized for the Divisional Yard Time inside the Annex on the tier.

Total Library Time for protective custody inmates is limited at the most to fifty minutes a week. There is usually no one there who has either the qualifications or the time to aid inmates in legal research, and they all testified that fifty minutes a week is insufficient to develop an appeal or other legal proceedings. While they can request a book loan, they can only take out one book at a time and, while they can request copies of cases from the New Hampshire Supreme Court Library, it is at their own expense.

Access to medical services constitutes another problem for protective custody inmates. One prison doctor services the entire prison population and sees between fifteen and thirty inmates a day. The doctor is on call twenty-four hours a day, seven days a week. There is a nurse on duty around the clock five days a week and a nurse on call during the weekend. This limited staff services approximately 280 men with a budget so minimal that the doctor annually furnishes out of his own pocket approximately $700 worth of medicines. With such a minimal staff and budget, the doctor simply does not have the time to make daily rounds either in the main cell block or the Annex.

In order to see the doctor, an inmate must request and fill out a sick slip giving his name and the nature of his complaint. A guard takes it from the inmate and delivers it to the appropriate box. When the doctor gets the slips, he sorts them, seeing only the "most important" cases. In exercising his discretion, his knowledge of the past history of the inmate plus the information given on the sick slip play a major part in his decision. However, because of the large number of requests inmates claim to have sent and the number actually received by the doctor, it is obvious that the guards are also exercising discretion as to who gets to see him.

This access problem is aggravated by the inmates' belief that they must "cut-up" in order to get medical attention. The inmates repeatedly testified that they had been told both by guards and the nurses, either directly or indirectly, that they must inflict wounds upon themselves if they wish to get medical attention. This testimony was directly contradicted. Several inmates told the court that they had purposefully cut themselves to get medical attention. Their medical records verified these stories of self-inflicted wounds. Defts.' Exs. 25, 26. One inmate said that he had had to get the help of both the mental health division and a lawyer to obtain treatment for chest pains. Another inmate told of bandaging himself with stolen medical supplies.

I need not decide whether or not the inmates have been instructed to cut themselves to get medical attention; the very fact that they believe it to be true and the fact that they believe that they must resort to self-help remedies indicates a lack of confidence so serious that it would seem to this court to be antithetical to any kind of medical treatment. This situation is, in the words of plaintiffs' expert Goff, "unconscionable." A close custody population must be strictly monitored for its health needs because of the stresses and strains inherent in such a situation. Medical rounds, according to Goff, would not only aid the prisoners directly and avoid the paranoia producing sick slip system, but would provide the administration with direct information on the well-being of the prisoners subjected to such unnatural restraints. According to the prison doctor, close custody inmates are three times as likely to attempt suicide as general population prisoners, and strict monitoring of such a dangerous situation, according to the experts, is necessary.

Finally, plaintiffs request that a separate grievance committee for protective custody prisoners be established. At present, the inmate grievance committee is made up of

and represents only the general population. Because the interests of the two groups are at times conflicting, this means that plaintiffs have no representation before the Warden and the prison administration. Individuals may, of course, air their grievances privately, but there is no group representation as there is for the general population.

The totality of these conditions and deprivations leaves a situation in which, according to plaintiffs' experts, almost anything would be an improvement. It is a barren but relatively safe existence for the plaintiff class.

### THE LAW

Plaintiffs, solely because of their need for protection from members of the general prison population, are housed in a separate part of the prison and are treated differently than are other prisoners at the New Hampshire State Prison. The issue this case raises is the constitutionality · of the conditions of confinement and the restrictions on activities imposed by defendants upon inmates with special protection needs.[3] Plaintiffs claim that the conditions of confinement in the protective custody unit and the deprivation of privileges subject them to cruel and unusual punishment in violation of the Eighth Amendment in that the conditions are so shocking as to violate all standards of human decency, that their sentences are rendered disproportionately harsh and punitive and that the conditions are more restrictive than is necessary to achieve legitimate penological goals. Plaintiffs further claim that defendants' practice of confining them under such disparate conditions violates their rights under the Equal Protection Clause of the Fourteenth Amendment. Finally, they assert that defendants are infringing upon their rights to exercise their religion as guaranteed by the First and Fourteenth Amendments and their right to access to the courts as guaranteed by the Sixth and Fourteenth Amendments by unnecessarily restricting their access to religious services and the law library.

It is important to clarify exactly what issues plaintiffs do not raise and what relief they desire. Plaintiffs do not contest defendants' authority and duty to keep them segregated from the general population; nor do they challenge the procedures by which they were assigned to the Annex. They raise, therefore, no due process claims. They do not seek a transfer from the New Hampshire State Prison or the Annex, nor do they wish to be released to the general population. They ask this court only to find that defendants are impermissibly restricting their rights and privileges under the First, Sixth, Eighth, and Fourteenth Amendments and to order appropriate relief.

■ Although plaintiffs are "voluntarily" in protective custody, I find that they have no real choice. The inmates testified that they would not trade the deadly monotony of their existence for a return to the general population and the relative freedom and diversion that exist there. They elect the sterility and boredom of the Annex simply because the alternative option is life in a place of terror and possible death.

> [A] preference for solitary confinement over the probability of death is not a real choice. *Sweet v. South Carolina Dept. of Corrections,* 529 F.2d 854, 868 (4th Cir. 1975) (Butzner, J., concurring).

*See also Breeden v. Jackson,* 457 F.2d 578, 581–82 (4th Cir. 1972) (Craven, J., dissenting). The fact that plaintiffs have requested protective custody and may return at any time to the general population does not constitute a waiver of any claims concerning the conditions of their confinement. The defendants' position to the contrary is based on semantics, not the realities of prison life. *Maynard v. Meachum,* 545 F.2d 273 (1st Cir. 1976).

■ Moreover, if defendants' argument were to be accepted by this court, defend-

---

**3.** This issue was delineated in Judge Craven's dissent in *Breeden v. Jackson,* 457 F.2d 578, 581–82 (4th Cir. 1972), and was specifically recognized, but left open by the First Circuit Court of Appeals in *O'Brien v. Moriarty,* 489 F.2d 941 (1974).

ants would be conditioning plaintiffs' exercise of their statutory and constitutional right to be reasonably protected from bodily harm upon a waiver of whatever rights they might have under the Eighth and Fourteenth Amendments.

> [C]onfinement in a prison where violence and terror reign is actionable. A prisoner has a right, secured by the eighth and fourteenth amendments, to be reasonably protected from constant threat of violence and sexual assault by his fellow inmates . . .. *Woodhous v. Commonwealth of Virginia,* 487 F.2d 889, 890 (4th Cir. 1973).

NH RSA 622:7. *Accord, Sweet, supra,* 529 F.2d 854; *McCray v. Sullivan,* 509 F.2d 1332, 1334 (5th Cir.), *cert. den.,* 423 U.S. 859, 96 S.Ct. 114, 46 L.Ed.2d 86 (1975); *Finney v. Arkansas Board of Correction,* 505 F.2d 194, 201 (8th Cir. 1974); *Martinez Rodriguez v. Jimenez,* 409 F.Supp. 582, 593, 594 (D.P.R.1976); *Pugh v. Locke,* 406 F.Supp. 318, 329 (M.D.Ala.1976). It is an elementary proposition of law that defendants may not condition plaintiffs' exercise of one constitutional or statutory right upon the waiver of another. Therefore, the fact that defendants would permit plaintiffs to leave protective custody at any time is irrelevant.

■ The Eighth Amendment to the United States Constitution expressly prohibits "cruel and unusual punishment." This phrase, although seemingly clear, is difficult to interpret and apply. There are three basic tests that have been adopted by the United States Supreme Court in its efforts to give the Eighth Amendment force. First, the Eighth Amendment bans any punishment that is shocking to the conscience or offensive to the dignity of humankind. *E. g., Trop v. Dulles,* 356 U.S. 86, 100, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958); *Francis v. Resweber,* 329 U.S. 459 (1947).

While this test has often been applied in the prison context, it has been narrowly construed in that area of the law. The courts have looked mainly to whether the physical conditions to which an individual, or even a whole prison population, has been subjected are so harsh or so far "below civilized norms as to be cruel and unusual." *O'Brien v. Moriarty,* 489 F.2d 941, 944 (1st Cir. 1974). *See e. g., Holt v. Sarver,* 309 F.Supp. 362 (E.D.Ark.1970), *aff'd* 442 F.2d 304 (8th Cir. 1971).

■ Under this analysis, segregated confinement has been held not to constitute a *per se* violation of the Eighth Amendment without aggravation by "inhuman or barbarous conditions." *O'Brien, supra,* 489 F.2d at 944. Here, plaintiffs allege that their mental and emotional health have been affected by their solitary incarceration. There is no doubt that this would be a natural result of their continuous isolation and idleness. "For a person to be cut off markedly from all others is a privation not to be underestimated, . . .." *Id.,* 489 F.2d at 944. However, this type of privation does not alone rise to the level of cruel and unusual punishment.

> [T]he isolation from companionship, severe restriction on intellectual stimulation and prolonged inactivity an inmate in solitary may often experience have generally escaped Eighth Amendment censure. *Johnson v. Anderson,* 370 F.Supp. 1373, 1387 (D.Del.1974).

Plaintiffs have not shown that the conditions of their incarceration are any more severe than those normally attendant upon segregated confinement, and I find no evidence of a mode of imprisonment that is so shocking or debased as to violate standards of common decency. *See Landman v. Royster,* 333 F.Supp. 621 (E.D.Va.1971); *Jordan v. Fitzharris,* 257 F.Supp. 674 (N.D.Cal. 1966).

The second test that has achieved Supreme Court approval and wide application is the disproportionality test announced in *Weems v. United States,* 217 U.S. 349, 367, 30 S.Ct. 544, 549, 54 L.Ed. 793 (1910).

> [I]t is a precept of justice that punishment for crime should be graduated and proportioned to offense.

Here, plaintiffs are not being punished for any intraprison offense; they are merely serving sentences imposed by New Hampshire State Courts as punishment for

criminal offenses, and there is no claim that the sentences themselves are disproportionate to the offenses committed. Once convicted, plaintiffs may be confined and subjected

> to the rules of [the] prison system so long as the conditions of confinement do not otherwise violate the Constitution. . .
> The conviction has sufficiently extinguished the [plaintiffs'] liberty interest to empower the State to confine [them] in *any* of its prisons. *Meachum v. Fano,* 427 U.S. 215, 224, 96 S.Ct. 2532, 2538, 49 L.Ed.2d 451 (1976). (Emphasis in original.)

*Meachum* ruled that a convict has no liberty interest in the place or conditions of his or her confinement sufficient to invoke the protections of the Due Process Clause of the Fourteenth Amendment. In *Moody v. Daggett,* —— U.S. ——, ——, 97 S.Ct. 274, 50 L.Ed.2d 236 (1976), the Supreme Court expanded *Meachum,* finding no protectible liberty interest in "prisoner classification and eligibility for rehabilitative programs . . . ." at —— n.9, 97 S.Ct. at 279.

■ I conclude that the underlying logic of *Meachum* and *Moody* is applicable in the Eighth Amendment disproportionality context. Because a convict does not have a liberty interest in the place or conditions of his confinement which overrides the discretion traditionally vested in prison administrators to determine where and how an individual will be imprisoned, I conclude that, without aggravating circumstances, the State's assignment of a convict to one institution or another is not, by itself, subject to the Eighth Amendment. Therefore, plaintiffs' sentences are not rendered disproportionate to the offenses which they have committed simply because they are in protective custody.

Finally, there is a third Eighth Amendment test which has achieved some, although indirect, Supreme Court approval. In the prison context, courts have held that it is a violation of the Eighth Amendment to subject a prisoner to unnecessary restrictions or privations.

[A] punishment may be cruel and unusual when, although applied in pursuit of a legitimate penal aim, it goes beyond what is necessary to achieve that aim; that is, when a punishment is unnecessarily cruel in view of the purpose for which it is used. *Jordan v. Fitzharris, supra,* 257 F.Supp. at 679.

The *Jordan* holding was adopted by the Virginia District Court in *Landman v. Royster, supra,* 333 F.Supp. at 645:

> Deprivations of benefits of various sorts may be used so long as they are related to some valid penal objective and substantial deprivations are administered with due process. "Security" or "rehabilitation" are not shibboleths to justify any treatment. Still courts must keep in mind that a recognized valid object of imprisonment is not just to separate and house prisoners but to change them. When it is asserted that certain disabilities must be imposed to these ends, courts may still inquire as to the actuality of a relation between means and end. The test of necessity will, as mentioned above, be more stringent when a deprivation of a fundamental constitutional right is involved.

*See also Hamilton v. Schiro,* 338 F.Supp. 1016, 1019 (E.D.La.1970):

> Prison life inevitably involves some deprivation of rights, but the conditions of plaintiffs' confinement in Orleans Parish Prison . . . are so much more cruel than is necessary to achieve a legitimate penal aim that such confinement constitutes cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments of the United States Constitution. (Cites omitted.)

This test was most recently voiced, albeit indirectly, by the Fourth Circuit:

> If the prisoner's health is being affected or it is practical for the prison authorities to grant additional exercise time to the plaintiff, without unduly imperilling security or without making unreasonable administrative difficulties for the prison authorities, the prisoner's constitutional

rights it would seem, are implicated. *Sweet, supra,* 529 F.2d at 866.

This court has adopted this test. *Hoitt v. Vitek,* 361 F.Supp. 1238, 1251 (D.N.H.), *aff'd sub nom., Laaman v. Vitek,* 502 F.2d 1158 (1st Cir. 1973).

The penological justification test was adopted in a different context and with a different emphasis by the Supreme Court in *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976):

> Although we cannot "invalidate a category of penalties because we deem less severe penalties adequate to serve the ends of penology," *Furman v. Georgia, supra,* [408 U.S.] at 451 [92 S.Ct. 2726, at 2834, 33 L.Ed.2d 346] (Powell, J., dissenting), the sanction imposed cannot be so totally without penological justification that it results in the gratuitous infliction of suffering. At 182, 96 S.Ct. at 2929.

*See Rudolph v. Alabama,* 375 U.S. 889, 891, 84 S.Ct. 155, 11 L.Ed.2d 119 (1963) (Goldberg, J., dissenting); *Estelle v. Gamble,* —— U.S. ——, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976).

It is a test, as recognized by the Supreme Court, that is essentially bottomed upon the due process notion of reasonableness.

> Statements of the general rule differ in their tone, but nonetheless make it clear that prison rules must pass the basic test of due process reasonability, with that test being more or less stringent according to the character of the right taken from the prisoner. *Gilmore v. Lynch,* 319 F.Supp. 105, 109 n.6 (N.D.Cal.1970), *aff'd sub nom., Younger v. Gilmore,* 404 U.S. 15, 92 S.Ct. 250, 30 L.Ed. 142 (1971).

The test comes into question when a prisoner complains of infringement upon a substantive constitutional right or when a prisoner makes a showing of arbitrary or unreasonable action.

■ This third test fits well into the protective custody context. Normally, the adjustment of rights and privileges, sanctions and restrictions in a prison context will not be reviewed by federal courts because they will be assumed to be logically and rationally related to legitimate penological ends. However, such an assumption is not warranted in a situation where, for no punitive reason, one group of prisoners is severely restricted in the benefits and privileges afforded another. This test assumes that, as a general proposition, "[p]risoners held in segregation for security or other non-disciplinary reasons must be provided as many of the privileges enjoyed by the general population as the nature of their confinement allows." *Battle v. Anderson,* 376 F.Supp. 402, 424 (E.D.Okla.1974). *See Wilson v. Beame,* 380 F.Supp. 1232, 1242 (E.D.N.Y.1974). The fact that defendants have granted specific privileges and benefits to the general population gives rise to a presumption that those privileges and benefits serve a legitimate penological purpose; the wholesale denial to a few of the exact same privileges and benefits lifts the cloak of that presumption from defendants' acts.

■ Plaintiffs have carried their burden of proof and have shown that defendants generally afford well-behaved inmates of the New Hampshire State Prison specific privileges and benefits, that they are deprived of many of these privileges for no punitive or other obvious legitimate reason and that such a wholesale deprivation has inflicted suffering upon them.[4] Therefore, defendants' distribution of privileges looses its presumption of legitimacy, and the bur-

---

4. *See Gilmore v. Lynch, supra,* 319 F.Supp. at 109.

> . . . the simple invocation of these phrases will not carry the day for plaintiffs, for they must further show that these rights are not only affected by the regulations under attack, but are infringed to such a degree as to render the justifications offered by the State inadequate and unreasonable as a matter of law.

*Cf. James v. Wallace,* 382 F.Supp. 1177, 1180 (M.D.Ala.1974).

> On the basis of the allegations set forth, plaintiffs would be permitted to introduce evidence tending to show that the defendants, or some of them, have prohibited members of the plaintiff class from, or refused to allow them, the opportunity to rehabilitate themselves by means not inconsistent with the orderly operation of the correctional system.

den shifts to defendants to show that plaintiffs' special suffering is not gratuitous, but that it is justified by a legitimate penological goal.

While much weight should be given to the determination of prison administrators that the deprivation of privileges is required in the particular case, the Court feels it must be bottomed on a showing of a reasonable relationship between the necessity to limit the liberty of the prisoner and the accomplishment of a legitimate penal aim. . . . Talismanic labels such as "protection", "threat to security" and the like cannot serve to validate solitary confinement unless prison officials can point to more specific penal objectives when they are faced by a legal challenge. Such a justification is a burden necessarily placed on prison administrators when they seek to establish a rational basis for administrative segregation. *Allen v. Nelson,* 354 F.Supp. 505, 512 (N.D.Cal.), *aff'd* 484 F.2d 960 (9th Cir. 1973).

██ Defendants must show only that there is some penological reason for the lack of privileges afforded the plaintiff class; the suffering must not be gratuitous. This is a minimal burden upon the defendants, but a real one. Talismanic labels will not suffice, and this court will look to the reality of defendants' justifications. I will not, as I cannot, pass judgment upon the wisdom of defendants' acts and regulations; under this third Eighth Amendment test, all that is necessary is that there be some penological rationale.

The Supreme Court has outlined what are "legitimate penological objectives of the corrections system." *Pell v. Procunier,* 417 U.S. 817, 822–23, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495 (1974).

An important function of the corrections system is the deterrence of crime. The premise is that by confining criminal offenders in a facility where they are isolated from the rest of society, a condition that most people presumably find undesirable, they and others will be deterred from committing additional criminal offenses. This isolation, of course, also serves a protective function by quarantining criminal offenders for a given period of time while, it is hoped, the rehabilitative processes of the corrections system work to correct the offender's demonstrated criminal proclivity. Thus, since most offenders will eventually return to society, another paramount objective of the corrections system is the rehabilitation of those committed to its custody. Finally, central to all other corrections goals is the institutional consideration of internal security within the corrections facilities themselves. It is in the light of these legitimate penal objectives that a court must assess challenges to prison regulations based on asserted constitutional rights of prisoners.

Following the mandate of the Supreme Court, it is in light of these four objectives that I will assess defendants' justifications for the denial to the plaintiff class of certain benefits and privileges.

██ It is important to note that the claim of insufficient funds is not a legitimate penological justification, and that, in the Eighth Amendment context, fiscal inability alone does not excuse the denial to some of privileges and benefits deemed necessary to achieve legitimate penological ends. Further, where the State claims fiscal interests in conjunction with the pursuit of legitimate penological ends, those interests must be established by proof for this court to consider them. Otherwise, the pocketbook interest is too easily asserted. *Jimenez v. Weinberger,* 417 U.S. 628, 633, 94 S.Ct. 2496, 41 L.Ed.2d 363 (1974). *See Landman v. Royster, supra,* 333 F.Supp. at 653.

Plaintiffs also assert that the conditions of their confinement in protective custody violate their right to Equal Protection of the law under the Fourteenth Amendment. Plaintiffs are well-behaved prisoners who, because of their need for special security, are treated essentially like disciplined inmates. They claim that the disparities between their treatment and that of other

well-behaved prisoners is a violation of the Fourteenth Amendment.

■ Included in the rights retained by convicted prisoners is that of Equal Protection of the law. *Wolff v. McDonnell,* 418 U.S. 539, 556, 94 S.Ct. 2963, 41 L.Ed.2d 945 (1974); *Lee v. Washington,* 390 U.S. 333, 88 S.Ct. 994, 19 L.Ed.2d 1212 (1968); *Sweet, supra,* 529 F.2d at 859; *Fortune Society v. McGinnis,* 319 F.Supp. 901, 904 (S.D.N.Y. 1970). Defendants' acts are presumed to be valid and must be approved unless plaintiffs show that they are not rationally related to defendants' purpose. However, if defendants' "classification impermissibly interferes with the exercise of a fundamental right or operates to the peculiar disadvantage of a suspect class," defendants must establish a compelling state interest for their disparate treatment of plaintiffs in order to pass constitutional muster. *Massachusetts Bd. of Retirement v. Murgia,* 427 U.S. 307, 313, 96 S.Ct. 2562, 2566, 49 L.Ed. 2d 520 (1976).

The plaintiffs certainly do not constitute a group

saddled with such disabilities, or subjected to such a history of purposeful unequal treatment, or relegated to such a position of political powerlessness as to command extraordinary protection from the majoritarian political process. *San Antonio School District v. Rodriguez,* 411 U.S. 1, 28, 93 S.Ct. 1278, 1294, 36 L.Ed.2d 16 (1973).

*E. g., Graham v. Richardson,* 403 U.S. 365, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971) (alienage); *McLaughlin v. Florida,* 379 U.S. 184, 85 S.Ct. 283, 13 L.Ed.2d 222 (1964) (race); *Oyama v. California,* 332 U.S. 633, 68 S.Ct. 269, 92 L.Ed. 249 (1948) (ancestry).

■ Plaintiffs urge that defendants' disparate treatment of protective custody inmates impinges upon their fundamental rights to freedom from cruel and unusual punishment, free exercise of religion, access to courts, privacy, human dignity and liber-

ty. Plaintiffs correctly assert that, if defendants' unequal treatment of protective custody prisoners infringes upon any of plaintiffs' fundamental interests, such action is subject to strict scrutiny by this court and may be upheld only if defendants prove a compelling governmental interest. *Memorial Hospital v. Maricopa County,* 415 U.S. 250, 94 S.Ct. 1076, 39 L.Ed.2d 306 (1974); *Dunn v. Blumstein,* 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972).

The Supreme Court has never articulated specific standards for determining what is a "fundamental interest," but has held certain rights to be fundamental. *E. g., Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973) (right to abortion); *Shapiro v. Thompson,* 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969) (right of interstate travel); *Williams v. Rhodes,* 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968) (First Amendment rights); *Harper v. Virginia Bd. of Elections,* 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966) (right to vote); *Skinner v. Oklahoma,* 316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942) (right to procreate). An enumerated right is not involved here; therefore, in order to determine the nature of the rights involved in this case, I must look to the guarantees contained in the Bill of Rights.

[T]he key to discovering whether . . . [a specific right] is "fundamental" is not to be found in comparisons of the relative societal significance of [the right] . . . Rather, the answer lies in assessing whether there is a right . . . explicitly or implicitly guaranteed by the Constitution. (Cites omitted.) *Rodriguez, supra,* 411 U.S. at 33–34, 93 S.Ct. at 1297.

■ Using this guideline, I find that access to the courts and religious exercise are fundamental rights; therefore, defendants must justify any infringements upon these rights with a compelling state interest. The other interests which plaintiffs assert are not fundamental.[5] *Meachum v.*

---

5. Plaintiffs argue that their right not to be cruelly and unusually punished is fundamental and that a finding that defendants are violating their Eighth Amendment rights must subject defendants' treatment of them to strict scrutiny. Because of the nature of my ruling in this case, I decline to accept plaintiffs' invitation. The third Eighth Amendment test that I have

*Fano, supra,* 427 U.S. 215, 96 S.Ct. 2532; *Moody v. Daggett, supra,* ── U.S. ──, 97 S.Ct. 274; *Lanza v. New York,* 370 U.S. 139, 82 S.Ct. 1218, 8 L.Ed.2d 384 (1962). Defendants' allegedly discriminatory acts must only be rationally related to an articulated purpose to pass constitutional muster. *Murgia, supra,* at 307, 96 S.Ct. 2562.

> The constitutional safeguard is offended only if the classification rests on grounds wholly irrelevant to the achievement of the State's objective. *McGowan v. Maryland,* 366 U.S. 420, 425, 81 S.Ct. 1101, 1105, 6 L.Ed.2d 393 (1961).

The rational basis test employs

> a relatively relaxed standard reflecting the Court's awareness that the drawing of lines that create distinctions is peculiarly a legislative task and an unavoidable one. Perfection in making the necessary classifications is neither possible nor necessary. *Dandridge v. Williams, supra,* 397 U.S. [471], at 485, 90 S.Ct. [1153], at 1162 [25 L.Ed.2d 491]. Such action by a legislature is presumed to be valid. *Murgia, supra,* at 314, 96 S.Ct. at 2567.

The permissible objectives of a state in running a penal institution have been clearly outlined by the Supreme Court. They are both the specific and general deterrence of crime, rehabilitation of convicts, and the maintenance of internal discipline and security. *Pell, supra,* 417 U.S. at 822–23, 94 S.Ct. 2800. The broad sweep of defendants' defense is that all of the deprivations plaintiffs suffer are necessary because of their special need for security. Plaintiffs accept that their separate housing in the Annex is necessary if they are to be safe; nevertheless, they assert that any further distinction in treatment between them and the general

population is unnecessary and not rationally related to internal security, deterrence or rehabilitation. I agree in part. In agreeing, I note that it is not sufficient for defendants to demonstrate that equal treatment would be fiscally difficult or impossible.[6] If defendants show that unequal treatment is justifiable on a basis reasonably related to a legitimate penal purpose, it must stand.

## CONDITIONS OF CONFINEMENT

Plaintiffs assert that specific physical conditions of their confinement are onerous and flagrantly unnecessary in violation of the Eighth Amendment. They complain of inadequate light, space and ventilation. These conditions stem primarily from the presence of security screens in the Fifth and Sixth Divisions, and plaintiffs agree that, but for the screens, they probably would not have raised these issues.

These conditions, although undesirable, are not shocking to the conscience, inhuman or barbarous. They are, however, peculiar to the Fifth and Sixth Divisions of the Annex and are conditions to which only protective custody prisoners are subjected. Therefore, I must consider whether defendants have asserted any justifiable penological reason for placing plaintiffs behind a steel mesh security screen.

 The experts uniformly testified that a steel mesh security screen is designed to protect correctional officers from the unruly and often violent behavior of troublesome inmates whose conduct mandates maximum security custody. The screen prevents such inmates from pelting guards with food and other objects from their cells, threatening them, or otherwise endanger-

---

applied is bottomed not only upon a due process notion of reasonableness, but a Fourteenth Amendment concept of equality. To subject defendants' treatment of plaintiffs to the stricter scrutiny because they have violated the third test under the Eighth Amendment would be to bootstrap plaintiffs into a preferred position.

**6.** This case is distinguished from *Dandridge v. Williams,* 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970). The Court in *Dandridge* found that the limitations on the budget of a

welfare program were a reasonable justification for the unequal treatment of the plaintiffs. There, the Court was dealing with a program whose purpose and very essence was fiscal; here, the purpose and goals of the New Hampshire State Prison have been statutorily and constitutionally defined by the State of New Hampshire. It is the punishment, safekeeping and reformation of convicts that concern defendants, not fiscal management. N.H.Const. Pt. 1, Art. 18; NH RSA 622:7.

ing the security of the prison. No one claims that plaintiffs pose such a threat. Defendant Helgemoe plans to house maximum security inmates in the Fifth and Sixth Divisions, and it was in anticipation of this change that he had the security screens installed. While confining noncombative inmates on a permanent basis in such an unnecessarily restrictive security situation may raise Eighth Amendment issues, plaintiffs are only housed there temporarily. Perhaps the wisdom of such an early installation can be questioned, but temporary adjustments and deprivations pursuant to an overall penological plan constitute no Eighth Amendment violation.[7]

Neither does this situation violate plaintiffs' equal protection rights. Defendants' temporary placement of plaintiffs in a section of the prison installed with security screens is rationally related to defendants' overall plans for ensuring discipline and order in the prison.

██ Plaintiffs complain of a fetid odor in their cells that is due to the combined effects of defendants' failure to provide them with basic cleaning supplies and to the lack of ventilation in their divisions. While seemingly a minor matter, such unpleasant conditions loom large to incarcerated persons, and all the more so to ones confined twenty-two hours a day. There was no allegation or evidence that the smell is dangerous to the health of plaintiffs. On the court's tour of the prison, the odor was not overpowering or nauseous, only disagreeable; however, the visit was made on a cool, clear and breezy day. I accept plaintiffs' allegations that, due to the smell, sleep becomes difficult at times. While limiting inmates' basic cleaning supplies offends the standards of common decency held by this court, I cannot say as a matter of law that such a practice alone violates the Eighth Amendment. There is no equal protection claim because apparently no inmates at the New Hampshire State Prison

receive a sufficient amount of cleaning supplies.

The situation should be ameliorated when plaintiffs are housed in an area without a security screen. I do observe, however, that it would cost little and improve the conditions greatly if plaintiffs were given the necessary material to clean their toilets and sinks properly.

## MEALS

Plaintiffs eat alone in their cells, and meals are not only served at abnormal times, but are bunched together so that there are approximately sixteen hours between dinner and breakfast. The general population eats communally and at relatively standard times. Further, they have second helpings of food which are rare in the Annex.

██ The eating schedule does not endanger plaintiffs' physical health, but, according to the experts, it retards rehabilitation. Part of the reform process necessarily includes normalization of as much of prison life as possible.

Defendants have not justified the odd timing of plaintiffs' meals except by pointing to the scheduling difficulties of feeding 280 men and by demonstrating the improvements that have already been made. I also accept the experts' description of meals as important social events. As Benjamin Franklin once noted, it is the company, not the food, that makes a meal. In addition, by feeding plaintiffs in their cells, defendants are compelling them to eat in the place where they spend all their hours and perform all their bodily functions. Defendants aggravate this unseemly situation by failing to give plaintiffs toilet brushes and cleaning supplies. I find that forcing plaintiffs to eat in their cells not only is aesthetically offensive, but it unnecessarily adds to the degradation of plaintiffs. No explanation was offered as to why plaintiffs could not eat communally either on their tiers or

---

**7.** The temporary nature of plaintiffs' complaint and the move which is to take place about the time judgment in this case issues will render moot the issues plaintiffs raise and the relief they seek.

in the prison library, both of which are secured.

This situation violates both plaintiffs' rights to equal protection and rights to be free of unnecessary and unreasonable restraints. *See Spain v. Procunier*, 408 F.Supp. 534 (N.D.Cal.1976). This disparate treatment of plaintiffs is neither rationally related to any legitimate penological goal nor is it penologically justifiable. It is merely a convenience to defendants to shift the entire burden of the scheduling problems inherent in managing a large institution onto one class of prisoners. This they may not do. Therefore, defendants must afford plaintiffs at least one communal meal a day and must normalize plaintiffs' eating schedule to the extent possible so that the scheduling problems are shared by all prisoners.

## SHOWERS

Plaintiffs are allowed five showers in fourteen days. They do not claim that this schedule threatens in any way the health of any of the plaintiffs. It is not, therefore, a barbaric limitation on plaintiffs' need to keep clean. *Sweet, supra*, 529 F.2d at 866; *McCray v. Sullivan*, 509 F.2d 1332, 1335 (5th Cir.), *cert. den.*, 423 U.S. 859, 96 S.Ct. 114, 46 L.Ed.2d 86 (1975) (two showers per week); *Krist v. Smith*, 309 F.Supp. 497 (S.D.Ga.1970), *aff'd*, 439 F.2d 146 (5th Cir. 1971) (two showers per week).

This does not end the matter. Inmates in the general population have access to daily showers, and the question arises whether defendants' limitation on plaintiffs' showering privileges is both penologically justifiable and rationally related to the achievement of legitimate penal goals.

The assumption made by this court that the privileges afforded the general population serve penological ends is borne out in this case. Plaintiffs' experts testified to the acute need of confined persons for activity, diversion and a different setting: any kind of stimulation for the body and mind. Showers may seem commonplace to free persons but assume a vital role in the prison setting. Plaintiffs' need to keep clean is increased simply because they are so tightly confined and the need for stimulation and diversion is so acute.

■ Defendants have not claimed any penological justification for this limitation other than a financial-logistical one, and defendants' claim of logistical difficulty does not stand scrutiny. Defendants did not explain to this court any reason why showers had to be limited to a period between 8:00 and 10:00 A.M. when much of the rest of the day, other than the early afternoon, as described by both parties, seems to be devoid of activity on the part of either the guards or the inmates. The limitation on plaintiffs' showers bears no rational relationship to rehabilitation, deterrence or security. However, when the prison timetable unfairly limits in the protective custody unit privileges which are granted the general population, defendants cannot then justify that limitation by simply asking the court to defer to that schedule. Blind deference is not blind justice, and I do not accept defendants' claim that their schedule in the Annex is immutable. The schedule itself shows the irrationality of the shower limitation. Plaintiffs must be afforded access to showers in the maximum amount possible in the Annex.

## EXERCISE

■ The restraints on plaintiffs' opportunity to exercise raises a substantial issue. There was evidence to the effect that prolonged inactivity is detrimental to the health of members of the plaintiff class, as it is to any human being, and constitutes a real health hazard. A threat to the bodily well-being of a prisoner forms the basis of a constitutional claim. *Woodhous, supra*, 487 F.2d at 890.

It has been held that the lack of an opportunity to exercise constitutes cruel and unusual punishment on the theory that posing a threat to the health of incarcerated persons is barbaric and inhuman.

Such indefinite limitation on exercise may be harmful to a prisoner's health,

and, if so, would amount to "cruel and unusual" punishment. *Sweet, supra,* 529 F.2d at 866.

For some courts, "[c]onfinement for long periods of time without the opportunity for regular outdoor exercise does, as a matter of law, constitute cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution." *Sinclair v. Henderson,* 331 F.Supp. 1123, 1131 (E.D.La.1971). *Accord, Spain v. Procunier, supra,* 408 F.Supp. 534, 547; *Rhem v. Malcolm,* 371 F.Supp. 594, 627 (S.D.N.Y.1974), *aff'd in relevant part,* 507 F.2d 333 (2d Cir. 1975). *Contra, Jordan v. Arnold,* 408 F.Supp. 869 (M.D.Pa.1976) (two one hour periods of exercise per week in punitive segregation constitutional); *cf. Hundley v. Sielaff,* 407 F.Supp. 543 (N.D.Ill.1975) (denial of daily recreation period not cruel and unusual). Courts have ordered that prisoners be given specified amounts of exercise and recreation. *Spain, supra,* 408 F.Supp. at 547 (one hour five times a week); *Hamilton v. Landrieu,* 351 F.Supp. 549, 550 (E.D. La.1972) (one hour five times a week). *See Rhem, supra,* 371 F.Supp. at 611–12, 626–27 (one hour daily); *Inmates of Suffolk County Jail v. Eisenstadt,* 360 F.Supp. 676, 692 (D.Mass.1973), *aff'd,* 494 F.2d 1196 (1st Cir. 1974).

■ In the instant case, plaintiffs are allowed on the tier two hours per day and in an outdoor recreation area five times in three weeks for a period of fifty minutes. Plaintiffs' segregated confinement is indefinite and will continue so long as they need special protection which will probably be the entire term of their sentences. I conclude that such a schedule of exercise over a long period of time constitutes a threat to plaintiffs' physical and mental health and, therefore, is cruel and unusual punishment in violation of the Eighth Amendment. At a bare minimum, plaintiffs must be given an opportunity for daily outdoor exercise, weather conditions permitting. Such time must not be in conflict with other regular

activities of plaintiffs, such as meals, sick call, etc.

Plaintiffs' Divisional Yard Time, *i. e.,* the time on the tier, is an opportunity for both movement, limited exercise and socializing. Plaintiffs ask that they be unlocked from their cells and allowed to socialize and exercise on their tier for a greater part of the day than is presently permitted. Defendants claim, as they did with showers, that scheduling problems do not permit more tier time. Defendants have not, however, convinced this court that scheduling problems actually do interfere; indeed, there was no evidence at all as to the duties of the afternoon-evening guards that would prohibit a 5:30–7:30 P.M. tier time. Defendants have not established a legitimate penological justification for locking plaintiffs in their cells twenty-two hours a day.

■ Moreover, leaving plaintiffs in their cells for the greater part of a day with such limited times for exercise and socialization is not rationally related to security of the prison or the safety of the inmates. No good reason has been advanced by the defendants as to why tier time could not be greatly expanded. Certainly, the present limitation does not promote deterrence of crime and, if anything, counteracts any rehabilitation that might occur. Therefore, defendants must allow plaintiffs more time on their tier in order to equalize as much as possible the conditions of protective custody to the conditions of the general confinement.

## REHABILITATION/WORK/EDUCATION

Plaintiffs complain that they are effectively denied the opportunities for education, rehabilitation, and work that are offered the general population. A few jobs are available to plaintiffs, but those that do exist are menial to say the least, and little is offered plaintiffs in the way of classes or programs. Because defendants must afford plaintiffs the same sort of opportunities available to the general population, I will not rule on whether or not such limitations alone violate common notions of decency.[8]

---

8. This is similar to an issue raised in an action presently pending before this court which concerns the adequacy of the rehabilitation opportunities available to the general population. *See Laaman v. Helgemoe,* Civil Action No. 75–258.

I presume that education and work are offered the general population in an attempt to either rehabilitate the inmates, deter criminal activity or secure internal discipline. Such programs might achieve any one of these goals. Plaintiffs are not given any similar opportunities to learn or reform, and the failure of defendants to provide plaintiffs with jobs and programs approximately equivalent in terms of interest and skill to those offered the general population "contributes to [plaintiffs'] mental and physical degeneration." *Pugh, supra,* 406 F.Supp. at 326. I find, as did Judge Johnson in *Pugh,* that the lack of programs, educational opportunities and work in the Annex "contributes to idleness, boredom, apathy and frustration," *id.* at 327, a situation which is antithetical to the achievement of any legitimate penological goal. In the words of expert Goff, "an idle population is a dangerous population."

Defendants assert that, if protective custody is made too attractive, there will be a "pull" from the general population into segregated confinement. Protective custody would become "easy time" and so popular that it would cease to be segregated or protective confinement. Defendants' fear is not only speculative and sweepingly broad, but, most importantly, it justifies a condition which

> impedes an inmate's ability to attempt rehabilitation, or simply to avoid physical, mental or social deterioration. *Pugh, supra,* 406 F.Supp. at 330.

Dehabilitation, not rehabilitation, would be the natural result of too few "comforts."

 I do not find, as indeed I am not asked to in this case, that a prisoner has an independent, constitutional or statutory right to work or to be given the opportunity to rehabilitate while incarcerated at the New Hampshire State Prison. I must note that, under the New Hampshire Constitution Pt. 1, Art. 18, and NH RSA 622:7, rehabilitation is definitely established as a penal goal. However, to deny rehabilitation opportunities to some while they are offered to others, is not a rational means of maintaining control over the flow of in-

mates into protective custody especially when there are less onerous and less costly ways of screening applicants. Defendants have not convinced this court that their failure to offer equivalent opportunities to plaintiffs has any connection, however remote, to the achievement of rehabilitation or any other legitimate penal goal.

The only other explanation offered by defendants for the dearth of programs in the Annex is the pocketbook argument, and this might well prove to be illusory if the failure to afford plaintiffs with job training and educational programs results in recidivism or creates "a dangerous population." Defendants themselves told the court that the recidivism rate of inmates from the protective custody unit is significantly higher than that for the general population.

I find that defendants' claims are not a rational basis for the denial to plaintiffs of some equivalent educational and work opportunities. Excess security, defeating rehabilitation, is neither rational nor penologically justifiable and may be unconstitutional. *Spain v. Procunier, supra,* 408 F.Supp. at 545. Therefore, plaintiffs are entitled to some opportunities to educate themselves and to work so long as those opportunities are offered the general population.

I do not mean that every program or job opportunity must be duplicated in the Annex. If the chance to learn a useful skill either through a job or a program is presented to the general population, a similar opportunity must be given plaintiffs. A discrete group of prisoners may not be denied the chance to learn or to work simply because it must be kept separate from the other prisoners.

 Defendants have not offered any evidence to show why plaintiffs should not receive idle pay when they do not work. Pursuant to this court's preliminary injunction, they presently receive idle pay, and plaintiffs now complain that, like others on the "Idle Crew," they must buy their own toiletries and cigarettes with the pittance the State gives them. However, plaintiffs have shown no special circumstances which would entitle them to greater benefits than

are received by the general population. Defendants' equal treatment of the idle members of both the protective custody unit and the main cell block is penologically justifiable.

## ACCESS TO MEDICAL SERVICES

Plaintiffs complain that they do not have adequate access to medical services. Their access is by the erratic sick-slip system. They claim that they often send notes to which they receive no response, and that the access situation is so bad that they are forced to cut themselves to obtain medical attention. They do not claim that they are treated differently than the general population, and, therefore, raise no equal protection claim.

Plaintiffs' experts testified, and I accept, that the sick-slip system is "paranoia producing" and is particularly ill suited for a close confinement situation. They also said that it was detrimental to plaintiffs' well-being to force them to traverse the main cell block in order to get to the infirmary. They suggested that the medical staff make daily rounds both for the psychological and physical benefit of the plaintiff class and to ensure that defendants are informed as to the health and well-being of plaintiffs.

 Plaintiffs showed no facts that lead this court to believe that plaintiffs' access to the medical staff is so grossly inadequate and haphazard or that it is so unresponsive to plaintiffs' special needs that it is cruel and unusual punishment. Indeed, the medical files of the named plaintiffs are replete with the doctor's notations of the numerous times each plaintiff has seen him in the past nine months.[9]

 Plaintiffs urge that, because they are a close custody population and allegedly need special medical scrutiny, they are entitled to a medical delivery system that is different from that for the rest of the inmates. They bolster this claim with the fact that their access to the infirmary is peculiarly burdened by the necessity of traversing the main cell block to get there. Accepting these allegations, I find that the situation as it is does not violate the Eighth Amendment.

Defendants have an affirmative duty to establish a medical care delivery system which is designed to meet the routine and emergency health care needs of the inmates committed to their custody. *Costello v. Wainwright*, 397 F.Supp. 20, 33 (M.D.Fla.1975), *aff'd in relevant part*, 525 F.2d 1239, 1246 (1975), and 539 F.2d 547 (5th Cir. 1976). Were the failure to provide such a system to lead to the failure to provide adequate medical care to prison inmates, such a situation would certainly violate the proscription of the Eighth Amendment. *Finney, supra*, 505 F.2d at 204; *Newman v. State of Alabama*, 503 F.2d 1320 (5th Cir. 1974), *cert. den.*, 421 U.S. 948, 95 S.Ct. 1680, 44 L.Ed.2d 102 (1975); *Fitzke v. Shappell*, 468 F.2d 1072, 1076 (6th Cir. 1972); *Campbell v. Beto*, 460 F.2d 765, 768 (5th Cir. 1972); *Craig v. Hocker*, 405 F.Supp. 656, 669 (D.Nev.1975); *Dillard v. Pitchess*, 399 F.Supp. 1225, 1237 (C.D.Cal.1972); *Battle v. Anderson, supra*, 376 F.Supp. at 424; *Eisenstadt, supra*, 360 F.Supp. 676.

However, there is no convincing evidence that defendants have failed to provide the plaintiff class with adequate medical care to meet their medical needs. All are presently in good health and have been able to see the doctor. There is access to the infirmary from the prison yard which is frequently used by plaintiffs. Dr. Walker, the prison doctor, testified that he watches plaintiffs during their outside yard time to see what health they are in. The medical

---

**9.** Plaintiff Nadeau saw Dr. Walker or a member of the medical staff twenty-six times between January 14, 1976, and September 19, 1976. Defts.' Ex. 25. Plaintiff Berry saw the doctor or a medical staff member six times between April 16, 1976, and September 19, 1976. Defts.' Ex. 26. Plaintiff Walker saw a medical person sixteen times between January 22, 1976, and September 18, 1976. Defts.' Ex. 27. Plaintiff Hunt saw a medical person eight times between January 22, 1976, and September 19, 1976. Defts.' Ex. 28. Plaintiff Stone saw a medical person eight times between March 10, 1976, and September 19, 1976. Defts.' Ex. 21.

sick-slip delivery system is no more onerous to plaintiffs than it is to the rest of the inmates at the New Hampshire State Prison.

Because there is an action pending in this court which concerns the medical facilities, treatment and delivery system at the New Hampshire State Prison, I am specifically reserving the question of whether the medical facilities, treatment and delivery system at the NHSP as a whole are so inadequate as to constitute a failure to provide adequate routine and emergency medical services in violation of the Eighth and Fourteenth Amendments. The holding here is limited to the treatment protective custody inmates receive in light of their peculiar situation.

## RELIGIOUS SERVICES

■ Plaintiffs claim that they are denied their First Amendment right to the free exercise of their religion because they have not been able to attend Catholic Mass. Plaintiffs' freedom to practice their religion is a preferred right that follows them into prison, subject, of course, to prison security needs. *Cruz v. Beto*, 405 U.S. 319, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972). It is required that

> the prison authorities provide the inmate with a reasonable opportunity for the exercise of his religious tenets in a form that is substantially warranted by the requirements of prison safety and order . . . . *Sweet, supra*, 529 F.2d at 863.

*Accord, LaReau v. MacDougall*, 473 F.2d 974, 979 (2d Cir. 1972), *cert. den.*, 414 U.S. 878, 94 S.Ct. 49, 38 L.Ed.2d 123 (1973); *Brown v. Peyton*, 437 F.2d 1228, 1231 (4th Cir. 1971); *Barnett v. Rodgers*, 133 U.S. App.D.C. 296, 410 F.2d 995, 1000–1001 (D.C. Cir. 1969).

■ I take as a starting point the Supreme Court's observation that

> [a] special chapel or place of worship need not be provided for every faith regardless of size; nor must a chaplain, priest, or minister be provided without regard to the extent of the demand. *Cruz, supra*, 405 U.S. at 322 n.2, 92 S.Ct. at 1081.

Plaintiffs have failed to convince this court that there is any real demand in the protective custody unit for regular Catholic Masses. Father Talbot testified that he stopped celebrating Catholic Mass in the protective custody unit because there was not a sufficient interest. He also said that he would see any man who desired to see him either for religious observations or counselling. The court accepts this testimony. So long as defendants put no impediment in the way of plaintiffs' worship and so long as religious consultation is available to them, I can find no deprivation or infringement upon plaintiffs' First Amendment rights.

■ Because there is no infringement upon a fundamental interest, defendants' failure to provide plaintiffs with the same opportunities to exercise their religion as are afforded members of the general population must be justified only by a rational basis. Certainly, a lack of interest on the part of plaintiffs is a reasonable justification for not offering Mass in the Annex.

## LIBRARY PRIVILEGES

Plaintiffs claim that their access to the prison library is unduly restricted and infringes upon their right to unimpeded access to the courts under the Sixth and Fourteenth Amendments. The prison library contains the law library, and plaintiffs allege that the weekly forty to fifty minutes that they are allowed in the library is insufficient time to prepare appeals or other legal matters. This problem is compounded by the fact that there is rarely anyone in the library who has either the time or the capacity to aid them in their legal work.

■ Access to the courts is a basic right of every person, including prisoners, and is a right which

> prison regulations must not unreasonably invade . . . without some persuasive governmental justification. *Cruz v. Hauck*, 475 F.2d 475, 477–78 (5th Cir. 1973).

*Accord, Johnson v. Avery*, 393 U.S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969); *Ex Parte Hull*, 312 U.S. 546, 61 S.Ct. 640, 85 L.Ed.

1034 (1941); *Nolan v. Scafati*, 430 F.2d 548, 551 (1st Cir. 1970). Not only is the state forbidden from interfering with a prisoner's access to the courts, but the Supreme Court has required that

> some provision must be made to ensure that prisoners have the assistance necessary to file petitions and complaints which will in fact be fully considered by the courts. *Gilmore v. Lynch, supra,* 319 F.Supp. at 110.[10]

This has

> placed on the state an affirmative obligation to provide ignorant prisoners with the means of intelligible communication to the judiciary . . . . *Stevenson v. Reed,* 391 F.Supp. 1375, 1380 (N.D.Miss. 1975), *aff'd,* 530 F.2d 1207 (5th Cir. 1976).

Therefore, "the state must provide a prisoner with reasonable access to adequate legal reference materials." [11] *Craig v. Hocker, supra,* 405 F.Supp. at 668. *Accord, Battle v. Anderson, supra,* 376 F.Supp. at 426; *Johnson v. Anderson, supra,* 370 F.Supp. at 1384–85; *Hooks v. Wainwright,* 352 F.Supp. 163 (M.D.Fla.1972).

Plaintiffs' access to the law library is clearly insufficient. Fifty minutes per week barely allows enough time for an unassisted person untrained in legal research to discover which book might be helpful. Allowing plaintiffs to take one book to their cells does not in any way satisfy defendants' affirmative duty. Research entails the use of many books, each one often being useful only as a reference to another book. Legal research is not like pleasure reading where one book may last a week. Defendants' claim that they allow plaintiffs to order copies of cases overlooks the fact that copies are expensive and are not paid for by the State.

■ Plaintiffs' special security needs pose no bar in fact to allowing them increased access to the library as the library is in the Annex and is secured. Moreover, their security status may not be used to interfere with their constitutional rights of access to the courts; it is too crucial a right to be sacrificed to the convenience or pocketbook of defendants. *See Johnson v. Anderson, supra,* 370 F.Supp. at 1384.

Defendants must, then, provide plaintiffs with

> a reasonable amount of time to prepare their legal documents. Therefore, inmates may attend the Law Library as often as they desire providing space is available. *Stevenson v. Reed, supra,* 391 F.Supp. at 1383.

Because all prison inmates have the right to effective access to the courts and because this ruling does not rest upon plaintiffs' special status, defendants may limit plaintiffs' access to the law library to accommodate the rights of other prisoners and as absolutely necessary for their own protection.

## VISITS

■ Plaintiffs, if they wish to see a visitor, must traverse the main cell block and receive the visitor at the same time and in the same room as members of the general population visit with their family and friends. Plaintiffs are, therefore, exposed to verbal abuse and the serious possibility

---

**10.** *Gilmore v. Lynch was summarily affirmed* by the Supreme Court in *Younger v. Gilmore,* 404 U.S. 15, 92 S.Ct. 250, 30 L.Ed.2d 142 (1971). It is, therefore, binding precedent upon this court. I note that the Supreme Court has granted certiorari in *Smith v. Bounds,* 538 F.2d 541 (4th Cir. 1975), *cert. gr.,* 425 U.S. 910, 96 S.Ct. 1505, 47 L.Ed.2d 760 (1976), a case which concerns the extent of a state's duty to provide a law library or some other kind of assistance to prisoners in order to realize their rights to access to the courts. However, in this case, plaintiffs do not question the adequacy of the law library at the NHSP or other assistance rendered by defendants. They are concerned only with the amount of time they are allowed to utilize the facilities that already exist.

**11.** The State has, of course, the choice of how to satisfy its duty to provide prison inmates with access to the courts. "Access to law books is a derivative right. It is not constitutionally required if effective access to the courts is assured by other means." *Johnson v. Anderson, supra,* 370 F.Supp. at 1385. However, in this case, defendants have not claimed that they provide alternative forms of assistance except for one prison attorney who is both overwhelmed by the caseload and limited in kinds of legal assistance he may render.

of physical assault throughout the visit. The practice of having members of the general population and protective custody inmates commingle with each other during visits flagrantly violates plaintiffs' rights "to be reasonably protected from constant threat of violence and sexual assault by [their] fellow inmates . . . ." *Woodhous, supra*, 487 F.2d at 890. Defendants urge that plaintiffs should not complain because no assault has yet taken place during visits. However, plaintiffs "need not wait until [they have been] actually assaulted to obtain relief." *Id.* at 890.

Defendants' practice certainly cannot be justified as achieving either rehabilitation, deterrence or internal security and inflicts unnecessary terror upon plaintiffs. In addition, the constant threat of violence undermines any beneficial effect visits might have for plaintiffs. Therefore, plaintiffs must be afforded visits at a secure time and place when and where exposure to danger is minimized.

The following order is attached. Judgment accordingly.

### ORDER

Defendants' motion for summary judgment as to all defendants in their individual capacities is granted.

Defendants' motion to reconsider this court's order granting a class action is denied.

IT IS HEREBY ORDERED that the defendants shall establish and implement rules, practices and procedures relative to inmates held in protective custody at the New Hampshire State Prison in a manner best calculated to assure the safety of the inmates housed in protective custody in accord with the following standards:

A. *Safety*

1. Protective custody inmates shall not be taken through the main cell block or any other area of the prison where members of the general prison population are located unless:
 a. it is necessary for the health or safety of such inmate, and

 b. such inmate is escorted by a sufficient number of correctional officers to assure the safety of such inmate.

2. No protective custody inmate shall be required against his will to participate in any activity, program or event attended by members of the general prison population.

3. Except by agreement of all protective custody inmates, no member of the general population may participate in or have access to any activity, program or event held for members of the protective custody population.

B. *Living Conditions*

1. Protective custody inmates shall be permitted to spend as much time out of their cells as do members of the general prison population. Such time shall include, but is not limited to, time on the tiers, exercise time out of doors, time in the library and the prison administration area.
 a. No order is made at this time relative to the security screens in the Annex. The court accepts the defendants' representations that protective custody inmates will be moved from this area on or before mid-December, 1976.

2. Mandatory lockup periods, such as but not limited to head count and nighttime lockups shall be the same for the protective custody population as they are for the general prison population.

C. *Meals*

1. Defendants shall provide protective custody inmates with facilities for at least one communal meal a day. Said meal shall be either lunch or dinner.

2. Defendants shall attempt to feed protective custody inmates at approximately the same hours as the general prison population, providing, however, that lunch shall not be served before 11:00 A.M. and supper shall not be served before 4:00 P.M.

3. All meals served to the protective custody population shall be of the same quality and quantity as the meals provided to the general prison population. Second helpings shall be available to protective custody inmates on the same basis as they are available to the general prison population.

D. *Showers*

Daily showers shall be made available to protective custody inmates and soap shall be provided.

E. *Exercise and Recreation*

Defendants shall provide protective custody inmates with daily access to an outside exercise yard for a time equal to that provided the general population for outdoor exercise but in no event less than one hour five days a week. Defendants shall provide protective custody prisoners with recreational equipment equal in quality and quantity to that provided to the general population.

F. *Educational and Vocational Services and Programs*

Defendants shall provide protective custody inmates with opportunities comparable to those provided the general population for educational and vocational services.

G. *Work and Idle Pay*

1. Defendants shall provide protective custody prisoners with the same type of vocational and work opportunities available to the general population. Such vocational or work opportunities shall not be limited to custodial and/or maintenance work, but shall include such meaningful work as light industries (for example, small furniture repair, small business machine repair), and community organization work (for example, preparation of tape recordings for the blind, collating and stapling, envelope stuffing). Protective custody prisoners employed in such vocational or work opportunities shall be paid pursuant to the Incentive Wage Plan established for the general population.

2. Protective custody prisoners who do not work shall be placed on the "Idle Crew" for the same reasons members of the general prison population are placed on the "Idle Crew," and shall be paid idle pay at the same rates paid to members of the general prison population.

H. *Library and Law Library*

Defendants shall provide protective custody prisoners with as much access to the library and law library as is reasonably necessary for the preparation of legal papers, subject to their safety needs, necessary prison security requirements, and the rights of access to the courts of all other prisoners at the New Hampshire State Prison.

I. *Visits*

Defendants shall provide protective custody prisoners with a separate and secure visitation room which can be reached without going through the main cell block. Defendants shall allow protective custody prisoners the same number and the same duration of visits as are allowed members of the general prison population.

This court shall retain jurisdiction over this case.

Defendants shall within thirty days submit to the court and opposing counsel an Implementation Plan. Such Plan shall detail the implementation of the rules, practices and procedures mandated by this Order and shall include specific timetables for putting into effect each rule, practice and procedure. No timetable shall exceed one hundred twenty days.

Plaintiffs shall review defendants' proposed Implementation Plan and shall submit to this court their comments and proposed changes within ten days of receipt of defendants' proposed Plan.

The actual implementation of any rule, practice or procedure that requires more than minor physical changes to the prison building or facilities shall be stayed pending appeal.

SO ORDERED.